KERNS v. LEE.

(Circuit Court, D. Oregon. January 22, 1906.)

No. 2,971.

1. PUBLIC LANDS—SUIT BY EQUITABLE OWNER—PATENT ISSUED THROUGH ERROR OF LAW.

A complainant who acquired the equitable title to or a vested interest in land while the title remained in the United States is entitled to maintain a suit to determine his right to the legal title against one to whom the land was subsequently patented through an error of law on the part of the officers of the land department without regard to whether the transaction was attended by fraud or mistake of fact.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Public Lands, §§ 341–345.]

2. SAME—FRAUD—SUFFICIENCY OF ALLEGATIONS.

Allegations in a bill that defendant applied to the state as permitted by a state law and obtained a quitclaim deed for lands, which the state claimed under the swamp land grant, and subsequently used such deed as evidence to obtain a patent to the land from the United States under a prior homestead entry, are insufficient to charge defendant with fraud, although it is also alleged that the state had previously conveyed its right in the land to one through whom complainant claims, and that defendant knew such fact and concealed it with the purpose to deceive the officers and defraud complainant.

.3. SAME—SWAMP LAND GRANT—SELECTION OF LANDS.

Under Swamp Land Act Sept. 28, 1850, c. 84, 9 Stat. 519, extended to Oregon by act March 12, 1860, c. 5, 12 Stat. 3, which made it the duty of the Secretary of the Interior to make out lists and plats of the swamp lands within a state which came within its provisions, and transmit the same to the Governor of the state, and, on his request, to cause a patent to be issued to the state therefor, the state had no. duty to perform in such selection and a selection of swamp lands made by its officers under an act of its Legislature was not binding upon the United States, unless approved and confirmed by the Secretary of the Interior; and gave the state no equitable title to or vested right in any of the lands so selected, which it could convey to another, where the selection has not been ratified and confirmed by the Secretary.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Public Lands, §§ 181–186.]

·4. SAME.

While Swamp Land Act Sept. 28, 1850, c. 84, 9 Stat. 519, operated as a grant in præsenti to the state, a state did not take the equitable title to or any interest in any particular tract of land thereunder until the same had been identified by the list made or approved by the Secretary of the Interior, and could make no conveyance of any such title or right as against the general government.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Public Lands, §§ 181–186.]

.5. SAME—PATENT TO HOMESTEAD SETTLER—CONCLUSIVENESS ON QUESTIONS OF FACT.

The action of the Land Department of the United States in accepting the final proofs of a homestead settler, and in issuing a patent to him thereon, in the regular course of procedure, and after the usual notice required in such cases, is conclusive that the land was not swamp or overflowed at the time of the swamp land grant so as to pass to the state thereunder, and a claimant, under such grant through the state. is bound by such decision whether or not he appeared and contested such question of fact.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Public Lands, §§ 323–328.]

In Equity. On demurrer to bill.

This is a suit in equity, the purpose being to have the defendant declared the holder of the legal title to the premises described in the bill of complaint, namely, lots 1, 2, 3, and 4 in section 10, and lots 1, 17, and 18 in section 15, in township 40 S., range 8 E. of the Willamette Meridian, in Klamath county, Or., in trust for the plaintiff. The cause of the suit is stated in brief (omitting formal allegations showing citizenship and amount in controversy sufficient to confer jurisdiction), as follows:

That prior to and during the year 1860, and for a long time thereafter, ·said land was swampy, marshy, overflowed, and unfit for cultivation, and was swamp and overflowed land within the meaning of the act of Congress of March 12, 1860, known as the "Swamp Act" (12 Stat. 3, c. 5) ; that subsequent to 1860, and prior to 1883, said land was duly selected by the state of Oregon, through its authorized agents, as swamp and overflowed lands, in pursuance of and in compliance with said act, which selection was duly filed and noted, and entered in the records of the register and receiver of the land office at Lakeview, Or.; that thereafter, to wit, on January 12, 1883, the ·state of Oregon, in pursuance of existing laws, executed and delivered, for value, a deed to all of said lands to one William P. Miller, and thereby conveyed the same to said Miller, with all its right, title, and interest therein, ·which deed was recorded in Records of Deeds for Klamath county, in volume 1, at page 500; that thereafter the said William P. Miller conveyed said lands, :through mesne conveyances, to the plaintiff, B. S. Kerns, and that said plaintiff is now the owner and holder of the said swamp selection; that the de-

fendant and his attorney and agent, F. H. Mills, have at all times since the year 1901 had actual and constructive knowledge of all the deeds constituting plaintiff's chain of title and that the swamp title to said land was in plaintiff; that on August 28, 1888, one William M. Rider filed on said land a homestead entry, known as "Lakeview Homestead Entry No. 1,097," and thereafter, on August 27, 1889, he commuted said entry to a cash entry, which is known as "Cash Entry No. 1,361"; that the said homestead entry of William M. Rider was a nullity, and conveyed no title, for the reason that said land had been previously granted and conveyed by the United States of America; that said land was swamp and overflowed land in 1860, and thereupon passed to the state of Oregon, but that the officers of the General Land Office at Washington, D. C., would not confirm the said swamp selection on account of the homestead entry of the said Rider: wherefore the state of Oregon and its grantees were unable to have said land confirmed as swamp land; that the defendant, acting in co-operation with his said agent, then conspired to and did defraud plaintiff out of all his right, title, and interest in and to the said land, and did, of date June 9, 1902, procure one Frank Bowne to obtain, for a nominal consideration, a bargain and sale deed to said land from the said Rider, and that on June 16, 1902, the said Frank Bowne executed a like deed to the defendant; that the defendant and his agent, for the purpose of deceiving the officers of the General Land Office at Washington, D. C., and inducing said officers to believe that the outstanding swamp title was no longer in the plaintiff, conspired to obtain a quitclaim deed from the state of Oregon, in pursuance of the act of February 25, 1889 (Laws 1889, p. 100), which deed they intended to exhibit to the officers of the General Land Office at Washington, and thereby to induce said officers to believe that the swamp title was in the defendant; that during August, 1902, pursuant to said conspiracy, the defendant and his agent, with full knowledge that the swamp title to said land was in the plaintiff, and without the knowledge or consent of plaintiff, did fraudulently apply to the state of Oregon for a quitclaim deed to said land, and did purposely conceal and suppress the fact that the state of Oregon had sold said land in 1883; that the defendant and his agent did not notify the plaintiff of their said action before the state land board, and did purposely and fraudulently, with a view to deceiving the state land officers, and for the purpose of defrauding the plaintiff herein, suppress and conceal the fact that the state swamp title was in the plaintiff; that the officers of the state were deceived thereby, and, being so deceived. on October 27, 1902, executed, on behalf of the state of Oregon, a quitclaim deed to all of the said land to the defendant, whereby the state purported to relinquish all its title thereto in favor of the defendant; that the act of the state land board in executing said deed was ultra vires, and without any authority of law; that the defendant, acting by himself and his agent, without the knowledge or consent of the plaintiff or the said Rider, and with a view to defrauding plaintiff, and for the purpose of deceiving the officers of the General Land Office at Washington, D. C., did apply to the Commissioner of the General Land Office at Washington to cancel the swamp selection of the state of Oregon, and to issue a patent to said land to William M. Rider for the benefit of the defendant, and the defendant and his agent and attorney did purposely and fraudulently represent to said Commissioner and officers of the General Land Office at Washington, D. C., that the swamp title to all of said land had been conveyed to the defendant by the state of Oregon, and that the state or Oregon had relinquished its swamp selection to all of said land in favor of the defendant, and that the defendant and his said attorney and agent did purposely and fraudulently conceal and suppress the fact that the state of Oregon had previously conveyed its swamp title to said land to William P. Miller, and that said title was then outstanding in the plaintiff; that the commissioner and officers of the General Land Office at Washington relied on said fraudulent and false representations, and, believing that the state of Oregon had relinquished its swamp selection, and not knowing that the swamp title was then outstanding in the plaintiff, canceled the swamp selection to said land, and issued a patent therefor to William M. Rider on January 13, 1903, for the benefit of the defendant, and thereby deprived the plaintiff of

the opportunity of having the swamp selection to all of said land approved and confirmed as swamp land, and thus deprived plaintiff of said land; that the defendant and his attorney and agent did purposely and fraudulently conceal, suppress, and withhold from the knowledge of the officers of the General Land Office at Washington, D. C., the fact that the plaintiff herein was the owner of the swamp title to said land, and did thereby mislead and deceive the said officers and induce them to cancel the said swamp selection, and to issue said patent; that the act of the Oregon Legislature of February 25, 1889, pursuant to which the state of Oregon attempted to execute the purported quitclaim deed to the said Joseph P. Lee, did not apply to the land that had been theretofore conveyed by the state, but only to land to which the state had swamp title at the time of the passage of said act; that said land was conveyed to William P. Miller in 1883, and hence the state did not own it in 1889; that all of the said acts and doings of the said defendant and his said agent are contrary to equity and good conscience, etc.

There is a demurrer to the bill, and the questions for determination are thus presented.

Charles J. Schnabel, for plaintiff.
F. H. Mills, for defendant.

WOLVERTON, District Judge (after stating the facts). It may be premised at the outset that if the plaintiff, by reason of the alleged swamp land selection by the state, the state's subsequent conveyance to William P. Miller, and the latter's transfer to plaintiff, through mesne conveyances acquired the equitable title to the land in controversy, or a vested right therein, he is in a position to maintain this suit to determine his right to the legal title, unless he has been subsequently deprived of that equity or right by lawful procedure. This would be so where the officers of the general government, through the application of an erroneous principle of law or a wrong interpretation of a statute, have subsequently granted the premises to another, without regard to the question whether the transactions have been attended by fraud or mistake of fact of which the plaintiff could rightfully complain. Stark v. Starr, 6 Wall. 402, 18 L. Ed. 925; Silver v. Ladd, 7 Wall. 219, 19 L. Ed. 138; Johnson v. Towsley, 13 Wall. 72, 20 L. Ed. 485.

I proceed upon this premise because I am of the strong impression that the allegations intended to impute concealment and fraud, in fact, to the defendant are specious, and wholly insufficient for the purpose. To illustrate, it is alleged that the defendant and his attorney and agent, with a view to deceiving the officers of the General Land Office and inducing them to believe that the outstanding swamp title was no longer in the plaintiff, conspired to obtain a quitclaim deed from the state in pursuance of the act of February 25, 1889 (Laws 1889, p. 100), and in furtherance of the conspiracy fraudulently applied to the state for such a deed, and in doing so purposely concealed from the state the fact that it had previously sold the land to Miller in 1883. It will be seen that the application for the deed was in pursuance of a law (whether the law be valid or not, or whether applicable to the present exigency, is immaterial), which the defendant must be accorded good faith in believing he had a right to invoke in furtherance of his title, and the state must be presumed to have been fully cognizant of the fact that it had previously executed a deed to Miller

for the land. This comes short of a concealment and fraud, as it affects the state. That the deed was obtained without notice to the defendant is another matter, that will receive attention later. In the same connection, it is further alleged that the act of the state land board in thus relinquishing the title of the state to such land was ultra vires, and without authority of law. This is but the assertion of a legal conclusion. Again it is alleged, in effect, that the defendant and his attorney and agent, purposely and fraudulently represented to the Commissioner of the General Land Office that the swamp land title had been conveyed to the defendant by the state, and that the state had thus relinquished its selection, and purposely and fraudulently concealed and suppressed the fact that the state of Oregon had previously conveyed its swamp title to said land to Miller; that relying upon said false representations, believing that the state of Oregon had relinquished its swamp selection, and being without knowledge or information that the swamp title was then outstanding in the plaintiff, the said Commissioner and officers of the General Land Office canceled the said swamp selection, and issued a patent therefor to Rider, defendant's predecessor.

Reduced to their ultimate signification, the allegations, with others in their connection, simply amount to this: That the defendant made use of the state deed to induce the officers of the Land Office of the general government to issue the commutation patent to the defendant's predecessor. It constituted an item of evidence in the procedure, and if incompetent we must assume that it had no weight with the tribunal intrusted with granting the final certificate and patent. It was not an act of fraud on the part of Rider to insist upon its consideration, nor was it an act of concealment or deceit of fraudulent import that he failed to disclose to the officers of the General Land Office the fact that the state had previously conveyed its swamp title to Miller. Obviously, he might, in anticipation that the plaintiff intended still to claim title under his deed, have very properly disclosed the fact of the existence of such a deed to such officers, but it could not be deemed fraudulent that he did not do so. The allegations of actual fraud and concealment, or fraud in fact, touching the procurement of the defendant's patent or title must therefore be dismissed from further consideration. The question then recurs, whether the plaintiff has acquired the equitable title to, or a vested right or interest in, the land in dispute, such as entitles him to the legal title; and this must be determined under the bill as a matter of law.

The swamp land act of September 28, 1850 (9 Stat. 519, c. 84), which was extended to this state by the act of March 12, 1860 (12 Stat. 3, c. 5), made it the duty of the Secretary of the Interior, as soon as practicable after the passage of the act, to make out accurate lists and plats of the swamp and overflowed lands, and to transmit the same to the Governor of the state, and at the request of such Governor to cause a patent to issue to the state therefor, upon which it was provided that the fee simple to such lands should vest in the state. It was further enacted, by the third section, that in making out the lists and plats of such lands, all legal subdivisions, the greater

part of which was "wet and unfit for cultivation" should be included therein; but that when the greater part of a subdivision was not of that character, the whole of it should be excluded. The act extending the benefits of this one to the state of Oregon provided further, in terms:

"That the grant hereby made shall not include any lands which the government of the United States may have reserved, sold, or disposed of [in pursuance of any law heretofore enacted] prior to the confirmation of title to be made under the authority of the said act."

By the second section the selection was required to be made from lands already surveyed within two years from the adjournment of the Legislature of the state at the next session after the date of the act; and as to all lands thereafter to be surveyed, within two years from such adjournment, at the next session, after notice by the Secretary of the Interior to the Governor of the state that the surveys had been completed and confirmed. The legislative assembly of the state of Oregon, by act of October 15, 1862 (Laws 1862, p. 105), constituted the Governor the state land commissioner, with authority to locate all lands to which the state was entitled from the general government, and enjoined upon him the duty of preparing accurate lists in triplicate of the lands by him selected, in manner prescribed by the laws of the United States and the instructions of the Commissioner of the General Land Office, one copy to be forwarded to the register of the land office in the district in which any lands were selected, and another deposited with the Secretary of State. In making such selection the land commissioner was required to designate for what purpose the land so selected should be applied. Deady's Gen. Laws, Or. 1843–1872, p. 629, c. 29. By another act of date October 26, 1870, which, by its preamble, recites, among other things, that, "Whereas, by the failure of the Secretary of the Interior to notify the Governor of the state that the surveys have been completed and confirmed in accordance with the provisions of said act, no swamp or overflowed lands have been selected in this state" (Laws 1870, p. 54), further provision was made touching the selection of such lands. The commissioner was required to appoint a suitable person or persons as his deputies to proceed, as soon as practicable, to select in the field all the lands rendered unfit for cultivation by inundation or overflow within the state, whose duty it became to describe each tract of such land they should select either by legal subdivisions or by actual survey, and return the same to the commissioner. It was also provided that, as soon as the selection of such lands in any county had been completed by the commissioner, he should make maps and descriptions thereof, in duplicate, one copy to be kept in suitable books in his office, and the other to be filed in the office of the county clerk of the county in which the lands were located. Thereafter, the commissioner was required to give public notice of the completion and filing of such selection. By the same act provision was made for the sale by the state of its swamp and overflowed lands. Deady's Gen. Laws, Or. p. 630, c. 29. These constitute all the provisions made by the state, so far as I have been able to dis-

cover, for the selection of lands of the character now under consideration.

Now, in view of these several statutes and regulations, national and state, relative to the selection of swamp and overflowed lands, it is not entirely clear what was meant by the allegation that, prior to 1883, said land was duly selected by the state of Oregon in pursuance of and in compliance with said swamp act. Under that act the state was required to do nothing except to ask for a patent when the lands had been listed to it by the Secretary of the Interior. The state or its officials could have no part in the selection, except as it or they might proceed under state enactments, and by these the general government was not bound unless it adopted or saw fit to ratify the acts of the state in that regard. So that the allegation referred to means but little, and the selection, or such as was made, must be taken to have been made by the authorized state officers under state regulations, and not in pursuance of the swamp act of the United States. In this the general government had no part, except that such alleged selection was noted and entered in the office of the register and receiver at Lakeview, Or. Did the selection thus made operate to vest the state with the equitable title to the particular land in dispute as a segregated entity? If so, Miller acquired it through his deed from the state, and the plaintiff now has it through mesne conveyances from Miller. As soon as there has been legal selection of swamp and overflowed lands tantamount to identification, the state must be considered to have acquired the equitable title, which it can dispose of as it may deem advantageous or profitable. However, prior to the passing of the legal title by the issuance of a patent, the grant is said to remain in process of administration, and the Land Department of the general government is not precluded from entertaining jurisdiction to determine in a proper case whether such equitable title has passed. By the more recent decisions of the United States Supreme Court, the doctrine is promulgated that "the act of 1850 made a grant in præsenti; in other words, the title then passed to all lands which at that date were swamp lands, and the only matters thereafter to be considered were those of identification," and that under such act "the legal title passes only on delivery of the patent." Michigan Land & Lumber Co. v. Rust, 168 U. S. 589, 18 Sup. Ct. 208, 42 L. Ed. 591; Brown v. Hitchcock, 173 U. S. 473, 19 Sup. Ct. 485, 43 L. Ed. 772.

The act of 1850 pointed out very specifically how these swamp lands should be identified, which was by the Secretary of the Interior, by making out accurate lists and plats thereof, and transmitting the same to the Governor of the state. The lists were presumably to be made from the returns of the United States surveys of the lands by including therein all legal subdivisions the greater part of which was "wet and unfit for cultivation." See section 3 of the act. Manifestly such lists could not be made by that officer without some previous designation as to the nature of the legal subdivisions, which it has been the practice of the surveyors general to enter upon their

surveys. In French v. Fyan, 93 U. S. 169–171, 23 L. Ed. 812, the court, speaking through Mr. Justice Miller, says:

"We are of opinion that this section (referring to section 2 of the swamp land act) devolved upon the Secretary [of the Interior], as the head of the department which administered the affairs of the public lands, the duty, and conferred on him the power, of determining what lands were of the description granted by that act, and made his office the tribunal whose decision on that subject was to be controlling."

So, also, it was said, in Michigan Land & Lumber Co. v. Rust, supra:

"But while the act operated as a grant in præsenti, the determination of what lands were swamp lands was entrusted to the Secretary of the Interior."

Such appears to be the only method that has been sanctioned generally by the federal government for the identification of these lands. In some instances the government has, by special legislation and through its officers of the land department, acted in co-operation with the states and their officers, and different methods have thereby been devised or sanctioned for identification, notably in Michigan and California. See Michigan Land & Lumber Co. v. Rust, supra; Wright v. Roseberry, 121 U. S. 488, 7 Sup. Ct. 985, 30 L. Ed. 1039; and Heath v. Wallace, 138 U. S. 573, 11 Sup. Ct. 380, 34 L. Ed. 1063. But these are exceptions to the general rule, and do not obtain, unless the special circumstances make it proper that they should be applied.

In Martin v. Marks, 97 U. S. 345, 24 L. Ed. 940, certain selections were made by the surveyor general of the state, which it seems from a certificate attached, were returned into the office of the Commissioner of the General Land Office, but without any evidence as to when such return was made. Speaking of this condition the court says:

"The above certificate of what took place in the office of the surveyor general shows what was the course adopted in Louisiana to secure the identification and lists of swamp lands in that state, and a similar course was elsewhere pursued. But these selections, though approved by the surveyor general, who was merely a local officer, still lacked the authentication of the Secretary of the Interior, to whom alone Congress had confided the duty of confirming them, or making them for himself."

And it was further said, that if the lists had been filed in the General Land Office at Washington prior to the confirmatory act of March 3, 1857 (11 Stat. 251, c. 117), the title to the state to lands embraced therein would have been confirmed by virtue of that act. Otherwise, we are left to the inference that the identification would have been wholly insufficient. Now, in the case at bar the selection relied upon for identification has in no way, so far as shown by the bill of complaint, been sanctioned or ratified by the general government, nor has the Secretary of the Interior approved any list, maps, or description of such lands prepared by the Governor or Land Commissioner of the state. Indeed, the lists were only filed in the local land office, and not with the Commissioner of the General Land Office or in the office of the Secretary of the Interior, so that the same may never have been brought to the attention of the latter officer for his confirmation or rejection. The action, therefore, of the Governor in

making the selection from legal subdivisions and actual surveys upon the ground, and the filing of his list in the local land office without the sanction, confirmation or ratification of the Secretary of the Interior, was not an identification of such land as swamp and overflowed land.

Prior to identification there could be no title in the state to any segregated parcel of land. The general grant of swamp and overflowed lands entitled the state to the selection, and when made an equitable title would vest, to obtain, in course of administration, until patent issued, when the legal title would become perfect. Prior to any selection the grant was in præsenti, it is said; but it is in the nature of a float, which attached to no particular parcel, and while the state might have contracted with reference to its anticipated title, it was vested with no specific interest in any particular tract that it was authorized or empowered to transfer or convey, because the United States had parted with nothing of the kind. The selection and identification was made an essential condition to the transfer or vesting of any specific title or other interest whatsoever; otherwise, the grant remained a float still, and was no one's land, but that of the general government, with obligations to make selections, and when made to convey the title by patent. The grant being in præsenti, it took precedence of other grants of public lands but vested no immediate title or interest in any particular parcel until identification, at which time, and not before, it attached definitely with relation back. The state, therefore, prior to identification acquired no interest that it could convey. It could contract with relation to its swamp land grant, perhaps, but it could convey no interest in any particular parcel. In this view, it is plain Miller acquired no vested or equitable interest in the land in dispute through his deed from the state, without previous selection and identification, that could avail him as against the general government or its grantees. While the deed from the state might operate as a contract that would require the state to confirm its title to the purchaser when obtained, yet it did not convey any interest that the general government was bound to take cognizance of or to protect, because not sanctioned by its authority.

Before the state could regularly dissolve its contractual relations with Miller or his assigns, it would be appropriate, no doubt, that the proceeding be accompanied with notice to the ultimate vendee and an opportunity to be heard; but such relations in no way affect the general government, as the state's vendee has obtained no interest through any procedure recognized by such government, and hence could have acquired no vested right or equity as against it or its assigns. Having acquired no such right or interest through the observation of such recognized mode of procedure, I am of the opinion that he is not in a position to invoke the aid of a court of equity for his relief, nor was he entitled to notice and an opportunity to be heard at any stage of the proceeding inaugurated by Rider for the purchase of such land from the general government. It was enacted by the legislative assembly of the state October 28, 1872, that:

"The right of the state to all swamp and overflowed lands within the state of Oregon held under the act of Congress, approved March 12, 1860, in pos- session of or claimed by any actual settler under the pre-emption, homestead, or donation laws of the United States before the same was selected as swamp or overflowed lands by the authorities of said state under the provisions of the act of the legislative assembly of the state of Oregon, approved October 26, 1870, and before such lands were claimed by any lawful claimant under the swamp land law of Oregon, shall be, and the same are hereby granted, re- leased, and confirmed unto said settlers, respectively occupying and claiming as aforesaid, any portions of said swamp or overflowed lands." Laws 1872, p. 138.

By a further provision the state was authorized and empowered, upon the settler or claimant presenting satisfactory evidence, to issue to the settler a quitclaim deed conveying all the right, title, and inter- est of the state in and to such lands claimed and occupied by him, under such homestead, pre-emption, etc., all without fee or charge. This legislation was possibly suggested by an act of Congress of somewhat similar import, of March 2, 1855 (10 Stat. 634, c. 147), authorizing patents to issue to settlers. By the act of February 25, 1885 (Laws 1885, p. 131), the Legislature again provided that:

"All the rights and title of the state of Oregon to the swamp and overflowed lands of this state, and claimed by persons who have completed settlement thereon under the provisions of the pre-emption or homestead laws of the United States, or claimed by their heirs or assigns, be and is hereby granted and confirmed to such claimants respectively."

And by a further section that:

"Upon application of any such claimant to the State Board of Land Commis- sioners, with proof of claim, evidenced by United States patent or final certifi- cate of proof of settlement and payment issued from the United States Land Office, said board shall execute and deliver to such claimant, without charge, a quitclaim deed of the State's right and title to the land so claimed."

This statute was virtually re-enacted in 1889 (Laws 1889, p. 100), with the further provision that any person "who may hereafter com- plete the settlement under the provisions of the pre-emption or home- stead laws," etc., "be and is hereby granted and confirmed," etc. This is the statute of which plaintiff complains. These acts indicate very well the policy of the state to relinquish its rights to the swamp and overflowed lands in favor of bona fide pre-emption and home- stead settlers. It could of course convey no title as against a pur- chaser from it acquiring a vested right prior to that of the settler, nor could the legislature arbitrarily divest him of such an interest.

It is alleged that the state conveyed to Miller in January, 1883, and that defendant's right or claim was not initiated until August, 1888, and that it was not until August, 1889, that he obtained his final cer- tificate from the general government. If, therefore, the plaintiff had acquired, through regular selection or identification and a deed and mesne conveyance from the state, an equitable interest in the premises, or a vested right therein, his right would undoubtedly have been su- perior to that of the defendant, and the state could not have con- firmed with effect the title of the settler. But the state board must have entertained the view that I now maintain, namely, that, there having been no proper or legal selection or identification of the par-

ticular tract in question as swamp and overflowed land, the state acquired no title that it could lawfully convey to Miller, and having conveyed none, either equitable or legal, it could legally confirm the title to the settler by issuing to him its quitclaim deed to the premises. This, I say, must have been the policy and thought of the state in taking action as it did. I need not, however, rest the decision here. If I should be in error in holding that Miller and his assigns obtained by his deed from the state no vested or equitable interest in the land in dispute, and that therefore he was not entitled to notice from the general government before his rights could in any manner be affected, the plaintiff has, notwithstanding, had notice or his day in court; that is, an opportunity to be heard upon the identical question whether the land was swamp and overflowed or not, and hence is precluded, by the action of the Secretary of the Interior in issuing final certificate or patent to the defendant under his homestead entry. Such is the holding of the Supreme Court of the state of Oregon in a recent case of Small v. Lutz, 41 Or. 570, 67 Pac. 421, 69 Pac. 825, where the federal authorities are collated. The land there involved had even been listed to the state by the Secretary of the Interior as swamp and overflowed lands in pursuance of the act of 1850, but the list was afterwards canceled without according the purchaser from the state a hearing, it being held that the claimant was given sufficient opportunity for a hearing upon the question whether the land was swamp or not when the Secretary of the Interior proceeded in regular order in determining whether the homesteader was entitled to his final certificate and patent. In doing so it was the duty of that officer to ascertain and determine whether the land was public or not, or specifically whether or not it was included in any previous grant, and necessarily therefore to determine whether it was not swamp or overflowed land. The court say, in that case, speaking through Mr. Justice Bean:

"When the defendant's application for a patent was made under his homestead entry, it became the duty of the Secretary of the Interior, as the head of the Land Department, and by virtue of his general control over the disposition of the public lands, as well as under the provisions of the swamp land act, to ascertain whether the land applied for was in fact public land, and, when the defendant's final proof was accepted, and a patent issued to him, it was in legal contemplation decided that the land was not swamp and overflowed within the terms of the grant to the state. The acceptance of defendant's final proof, and the issuance of a patent to him, were, so far as appears, made in the regular course of business and orderly administration of the laws of the United States relating to the disposition of public lands, after the usual notice in such cases. The plaintiff could have appeared and contested the defendant's right to a patent, on the ground that the land was in fact swamp and overflowed, and passed to the state by the swamp land act. He did not pursue that course, but, nevertheless, the action of the Land Department is as conclusive upon him as if he had appeared and made an unavailing contest."

So in the case at bar the usual notice given, which precedes the final proof on a homestead entry, afforded opportunity to the plaintiff to appear and contest the right of the homesteader to his patent, and a showing that the land was in fact swamp and overflowed land would have defeated that right; but failing in such appearance, he

is precluded by the determination of the Secretary of the Interior that the homesteader was entitled to a patent, and cannot be heard now to say, as against that patent, that the land was swamp and overflowed in 1850, as he alleges.

It follows that the demurrer to the bill of complaint must be sustained, and such will be the order of the court.